UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| DEREK R. PEARSON, | ) | Case No. 1:06CV1974 |
| | ) | |
| Plaintiff, | ) | Judge Oliver |
| | ) | Magistrate Judge Vecchiarelli |
| v. | ) | |
| | ) | PLAINTIFF'S REPLY TO |
| UNIVERSITY HOSPITALS OF | ) | DEFENDANT'S MOTION |
| CLEVELAND, INC., | ) | FOR SUMMARY |
| | ) | JUDGMENT |
| Defendant | ) | |

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

The Plaintiff, Derek Pearson, has made the precise two-part showing required by the Sixth Circuit to defeat a motion for summary judgment in a case of discrimination under the Americans with Disabilities Act (alternatively, hereinafter, "ADA").  Not only has Mr. Pearson successfully stated a *prima facie* of discrimination under the ADA, but he has demonstrated that Defendant's explanation for its conduct is pretextual.  Therefore, the Defendant's motion must be denied.

### I.    STATEMENT OF FACTS

The Plaintiff, Derek Pearson, is an alcoholic and has been an alcoholic for many years prior to his work for the Defendant (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).  Not only is Mr. Pearson an alcoholic but he is an advanced one; he craves for a drink every day (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).  Mr. Pearson's compulsion to drink is so strong that on many days he feels nauseous, will

1

begin to shake for no apparent reason, and will become anxious and nervous (Plaintiff

Affidavit, Attached hereto as Plaintiff's Exhibit 1). Plaintiff Pearson believes that this

resulting level of anxiety has a direct impact on his arthritis and, as a result, when he has

anxiety flare ups, his arthritis will become debilitating (Plaintiff Affidavit, Attached

hereto as Plaintiff's Exhibit 1).

When Mr. Pearson's alcoholism caused him to be tardy to his job in 2005, he

approached his supervisor, Mr. Krall, with his problem, and Mr. Krall then placed Mr.

Pearson in a urine monitoring program for UH employees called the "Employee

Assistance Program." Under this program, Mr. Pearson was required to report to the

EAP office at UH 3 times per week to provide urine samples. Mr. Pearson believes that

the discipline of participating in this program helped to keep him sober (Plaintiff

Affidavit, Attached hereto as Plaintiff's Exhibit 1).

Mr. Pearson also believes that if he were to stop fighting his alcoholism, he would

be dead by this time (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). When

he is drinking, he binges, cannot take care of himself, and the simplest tasks become

impossible (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). He looses track

of time, does not eat and does not care for himself or anyone else (Plaintiff Affidavit,

Attached hereto as Plaintiff's Exhibit 1). Mr. Krall and the EAP division of University

Hospitals have been fully aware of Mr. Pearson's condition for several years.

The following time line is critical to the applicable facts:

**1. Friday, December 30, 2005**: Mr. Pearson was sober on this date. This was the last

day that Mr. Pearson was allowed to work for University Hospitals. He was not tardy

and was under no warning, and as far he knew he was in good standing with his

2

employer, UH (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).  Mr. Pearson, scheduled to work from 3:00 pm – 11:30 pm, went to work as normal and returned home without incident (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**2. Saturday, December 31, 2005**:  Mr. Pearson was sober on this date. Mr. Pearson was scheduled off on this date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**3. Sunday, January 1, 2006**:  Mr. Pearson was sober on this date. Mr. Pearson was scheduled off on this date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**4. Monday, January 2, 2006**:  Mr. Pearson was not feeling well Sunday night. His anxiety level was high, he felt shaky and his joints hurt, particularly his back.  He called off work sick.  Mr. Pearson was sober on this date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**5. Tuesday, January 3, 2006**:  Mr. Pearson again was not feeling any better and he called off work (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).   On both of these days, he called his outpatient program to inform them that he was sick.  He also left messages with his alcohol program office (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).   He also called Sue Peplowski, who is in charge of employee affairs (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).   Worrying that he might be on tardiness warning, Mr. Pearson inquired about his status under the attendance policy, in order to confirm it was safe to have called off work (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).   Mr. Pearson was informed by Ms. Peplowski that he was allowed to call off sick and that he was still in compliance with the attendance policy.  Mr. Pearson was sober on this date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**6. Wednesday, January 4, 2006**:  Mr. Pearson attempted to talk to Steve Krall, his supervisor, on this date.  When Mr. Krall returned the call, Mr. Pearson explained his problem. Mr. Krall immediately asked Mr. Pearson if he had been drinking and Mr. Pearson told him he had not (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). Mr. Pearson also told Mr. Krall that he had talked to Sue Peplowski about his attendance, that she had called Mr. Pearson's outpatient program and had left a message explaining that Mr. Pearson was sick (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). Mr. Krall expressed approval and told Mr. Pearson not to worry about his attendance or about work, as long as he took care of himself. (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).  Mr. Krall also instructed Mr. Pearson not to report to work until he had gotten himself together.  Mr. Pearson's arthritis and high blood pressure were making him feel really bad (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).  Mr. Pearson informed Mr. Krall that he was missing his sessions for the outpatient program and Mr. Krall replied that if Mr. Pearon was sick, he could not attend his sessions and still refuse to come to work, since the outpatient program was right there on University Hospital premises (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).  Mr. Krall directed Mr. Pearson to stay home until he felt better.  Mr. Pearson's messages were not returned from the outpatient program, which made Mr. Pearson worry about his status in the program. Mr. Pearson was sober on this date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**7. Thursday, January 5, 2006**:  Mr. Pearson again spoke with Mr. Krall this date and asked if he could return to work because he was feeling better at this time.  Mr. Pearson reminded Mr. Krall that he was missing his sessions in the alcohol program at the

4

Hospital, but Mr. Krall again told Mr. Pearson not to come to work and assured him that he had nothing to worry about (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). However, Mr. Pearson did begin to worry. Mr. Krall had told Mr. Pearson throughout that Mr. Krall would be there to help Mr. Pearson in any way he could and so Mr. Pearson had put his trust in Mr. Krall (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

Mr. Pearson had not heard back from his outpatient treatment program but Mr. Krall continued to direct him not to come to work (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). Mr. Pearson was able to contact his employee assistance counselor, Ms. Swan, and informed her of the situation. She asked Mr. Pearson if he was missing work because of drinking and he told her was not and that he was following Mr. Krall's directions. Ms. Swan later called Mr. Pearson back later and told him that she didn't understand what was going on because she was unable to reach Mr. Krall. Mr. Pearson was sober on this date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**8. Friday, January 6, 2006**: Mr. Pearson continued to use the call-in system, as instructed by Steve Krall. As of this date, Mr. Pearson had not received word back from his counselor. Mr. Pearson called Mr. Krall to tell him again that he was feeling better and needed to go to his sessions, but Mr. Krall again told Mr. Pearson to get himself together before returning to work (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). At this point, Mr. Pearson was in fear of losing his job, and since he no longer had access to the EAP program, Mr. Pearson again called Mr. Krall and stressed to him that he needed to resume his outpatient treatment. Mr. Pearson requested Mr. Krall's permission to go to the Salvation Army for treatment and, since no one else was

5

responding to his calls, Mr. Pearson told Mr. Krall he needed his help with the paperwork. Mr. Pearson did not understand why he was getting no response from his outpatient program. Mr. Pearson was sober on this date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**9. <u>Saturday, January 7, 2006</u>**: Mr. Pearson called Mr. Krall who told Mr. Pearson to proceed with the Salvation Army inpatient program. Mr. Krall stated that he would handle all the necessary paperwork on his end, but told Mr. Pearson that he would need to go through the inpatient program before he could return to work. Mr. Pearson was now feeling desperate because he didn't know if he had a job and knew that without his job he had no insurance to cover his alcohol program. At this point, the most important thing for Mr. Pearson was to find a way to get into a treatment program. Mr. Pearson was sober on this date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**10. <u>Sunday, January 8, 2006</u>**: Mr. Pearson called Mr. Krall. After stating that he needed to be at work to get into the inpatient program at the Salvation Army, Mr. Krall again told Mr. Pearson not to report to work. In issuing these instructions, Mr. Krall was not only preventing Mr. Pearson from coming to work, but he was also preventing Mr. Pearson from reporting to the alcohol treatment at UH. Mr. Pearson was sober on this date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**11. <u>Monday, January 9, 2006</u>**: Mr. Pearson finally managed to talk to the intake director at the Salvation Army who explained to Mr. Pearson that their program was a 90-day program, but that UH would only allow him a 30-day period to be off work. Mr. Pearson then called Laurelwood and was told that his insurance didn't cover inpatient treatment. Mr. Pearson then heard from the counselors at his outpatient program at

6

University Hospitals who scheduled a meeting for Mr. Pearson.  He also called Mr. Krall and let him know that all else had failed and he had finally gotten back in touch with the outpatient program counselors who had set up a meeting to talk about how to proceed and to see about getting Mr. Pearson back into the program and an appointment was set for the next day.  Mr. Krall told Mr. Pearson to do whatever it would take to get his treatment.  Mr. Pearson again asked Mr. Krall if he could work on this day and Mr. Krall refused, but Mr. Krall did allow Mr. Pearson to come onto UH premises to attend the meeting with his outpatient counselors.  Mr. Pearson was sober on this date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

**12.  Tuesday, January 10, 2006**:  Mr. Pearson attended the meeting with his outpatient counselors and was told that he would be put back in the program.  They also told him that Mr. Krall had no right to tell him to stay off of the premises knowing that he was participating in a treatment program.  He then called Mr. Krall and informed him that he was back in the outpatient program at the hospital and that he program needed to know when he could return to work (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).  Mr. Pearson then called Ms. Swan, his employee assistance counselor, and was told that while he was out sick he had missed a drug screen but that this was understandable since he was out sick. (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).  That day, Mr. Pearson talked with Mr. Krall, Ms. Peplowski and Ms. Swan, who were to be making a decision as to when he would return to work (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).  They repeated that the other was responsible for making the return date decision, while maintaining that Mr. Pearson was still employed at UH.  Yet, later that day, Mr. Pearson received a call from Mr. Krall who stated that Mr.

7

Pearson's employment had been terminated.  Mr. Pearson was sober on that date (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

## II.    LAW AND ARGUMENT

### A.  Standard of Review

To prevail on a motion for summary judgment, the moving party must demonstrate that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any" all show 1.) there is "no genuine issue as to any material fact" and 2.) "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  However, a factual dispute will be deemed to constitute such a "genuine issue" if "a reasonable jury could find for the nonmoving party on that issue." *Moore v. Baptist Memorial Health Care*, 398 F.3d 469, 486.  Finally, in reviewing a party's motion for Summary Judgment, "all facts"—and any inferences drawn from these facts—must be viewed "in the light most favorable to the nonmoving party." *Id.* at 486.

Given that Defendant falls short of the above standard in its Motion for Summary Judgment, this motion must be denied.  Contrary to the Defendant's assertion, Plaintiff does make out a *prima facie* case of disability discrimination under the Americans with Disability Act, and, while the Defendant's motion may provide an explanation for its decision to terminate (i.e., that Plaintiff's own "excessive absenteeism" created the basis for the termination decision), Plaintiff has demonstrated in its response that this proffered explanation is pretextual.  According to the standard of review applicable to a motion for summary judgment, reiterated in *Moore*, the clearly disputed facts surrounding Plaintiff's termination—and any inferences drawn from these facts—must be interpreted in the light most favorable to Plaintiff as the nonmoving party.  Therefore, because a reasonable jury

could readily accept Palintiff's view and find for him on the issue of pretext alone, two conclusions follow: 1.) a "genuine issue" clearly *does* exist and 2.) defendant is consequently *not* entitled to judgment as a matter of law.

### B. Plaintiff can make the required two-part showing to overcome Defendant's motion for summary judgment

The Americans with Disabilities Act ("ADA"), which targets employment discrimination on the basis of an employee's disability, specifically prohibits a covered employer's practice of disability discrimination in any of the following forms:

> [n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C.

In the Sixth-Circuit case of *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775 (6th Cir. 1998), the Court prescribes the two-part demonstration that must be made by an ADA plaintiff claiming any of the above forms of disability discrimination to "defeat an employer's motion for summary judgment." *Id.* at 779.   As explained by the Court, the plaintiff must first make out a *prima facie* case of disability discrimination. Next, following the defendant employer's submission of a "non-discriminatory explanation," the plaintiff must proceed to show that the employer's explanation is in reality a pretext for the discriminatory employment decision. *Id.* at 779.

### C. Plaintiff has fulfilled all the requirements of a *prima facie* case of disability discrimination under the Americans with Disabilities Act

As explained in *Cehrs*, the ADA plaintiff must first set out a *prima facie* case of discrimination to prevail at the summary-judgment stage. *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 779 (6th Cir. 1998). However, and contrary to Defendant's assertions about the particular *prima facie* case insisted upon in its own motion, the Sixth-Circuit has limited the three-part prima facie demonstration outlined by the defendant to cases based on "direct evidence" of discrimination. As made clear by the court in *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), this is not the proper approach to follow in cases involving "indirect evidence" of discrimination, which warrant a different five-prong approach. Reciting the elements of the proper *prima facie* case as outlined in *Monette*, the *Cehrs* court again lays out what the ADA plaintiff must initially show in presenting a case involving "indirect evidence" of discrimination:

> (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or should have known of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 779 (6th Cir. 1998). (citation and internal quotation marks removed).

Because Plaintiff can satisfy all of the above criteria, he can successfully make out a proper *prima facie* case of disability discrimination.

###     1.    Derek Pearson is disabled under subsection (A) of the statutory definition of disability

10

Under the Americans with Disabilities Act, a "disability" is defined as an individual's experience of one or more of the following:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

> (B) a record of such an impairment; or

> (C) being regarded as having such impairment.

In order to establish the existence of a disability under section (A) of the above statutory definition (the section most clearly applicable to the instant case), a plaintiff asserting such a disability must demonstrate the following facts: 1.) that the individual's disability constitutes a "mental or physical impairment"; 2.) that the life activity or activities impacted by the impairment are considered "major life activities" under the ADA; and 3.) that the impairment substantially limits such activities. *Bragdon v. Abbott*, 524 U.S. 624.

Because Plaintiff can show that his experience of alcoholism meets all three of the above definitional requirements, his alcoholism qualifies as a recognized disability under the ADA.

### a. Derek Pearson's alcoholism constitutes a physical impairment

Although the defendant in its motion makes much of the fact that Mr. Pearson is only intoxicated 5-10% of the time, the defendant's focus on periods of intoxication is unsupported by US Supreme Court and Sixth-Circuit case law and thus by no means dispositive of whether or not a given condition constitutes a physical impairment.  In *Bragdon v. Abbott*, 524 U.S. 624, the Court held that an HIV infection, although in a dormant or "asymptomatic phase," did satisfy the statutory definition of "physical

11

impairment" under the ADA. *Id.* at 624.   In a parallel, sixth-circuit case involving a plaintiff suffering from "pustular psoriasis," the court held:

> [i]t is not necessary that [the plaintiff] experience flare-ups on a daily basis in order to characterize pustular psoriasis as a physical impairment.  Accordingly, we hold that [the plaintiff's] case of psoriasis is a physical impairment because of the ongoing nature of the disease and its physiological impact even during its dormant stage. *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 780 (6th Cir. 1998).

Plaintiff Pearson's account of the day-to-day experience of his disability testifies not only to the "ongoing nature" of his alcoholism, but also to its "physiological impact," even during periods of sobriety.   For example, even during periods of sobriety, plaintiff testifies that he must engage in a constant struggle against "craving[s]" for alcohol that are so strong that they manifest in a range of psychological and physiological symptoms, such as "nausea," "shaking and sweating," "anxiety," and "flare-ups" of Pearson's arthritis.  (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).  Given the ongoing nature of Pearson's alcoholism, along with its psychological and physiological impact upon Pearson *even when sober*, Pearson's alcoholism clearly satisfies the *Cehrs* standard for "physical impairment."

### b. The life activities affected by Derek Pearson's alcoholism are considered major life activities under the ADA

Plaintiff Pearson's experience of alcoholism involves a number of the life activities that have been recognized as "major life activities" by Sixth-circuit case law.

The second requisite factor to be considered in determining if a particular

impairment constitutes a disability under the ADA is whether or not the life activity affected by a plaintiff's impairment is considered a "major life activity." Citing examples of "major life activities" listed in the federal regulations implementing the ADA, the *Cehrs* court held that such "major life activities" included, in part, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' 29 C.F.R. § 1630.2(i)." *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 780 (6th Cir. 1998).

Plaintiff Pearson's account of his alcoholic binges makes clear that a lapse into drinking impacts the entire range of "functions" referred to above: "When I am drinking, I binge and cannot even take care of myself. The simplest tasks become impossible. I loose track of time even days, I don't eat and I don't care for myself or anyone else." (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). However, even during periods of sobriety, Pearson's alcoholism directly impacts his ability to "walk" and perform "manual tasks," since his cravings for alcohol translate into a level of anxiety that is physically debilitating, particularly when combined with his arthritis condition: "My anxiety is somehow contacted to my arthritis and when I have anxiety flare ups my arthritis is often so bad I cannot work." (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). Since these affected activities (caring for oneself, walking, performing manual tasks and working) are considered major life activities under the ADA, Pearson's alcoholism clearly satisfies the second requirement for a statutorily recognized disability.

      **c. Derek Pearson's alcoholism substantially limits these major life activities**

Pearson's alcoholism also satisfies the final statutory requirement since his impairment "substantially limits" such "major life activities."

In order to qualify as a recognized disability, the plaintiff's impairment must not only involve, but must "substantially limit," a "major life activity." Pursuant to the implementing regulations found in 29 C.F.R. § 1630.2(j)(2), the Sixth-Circuit has set out the factors to be considered in determining an impairment's impact on a major life activity. Such factors include: 1.) the nature and extent of the impairment itself; 2.) the impairment's duration; and 3.) the duration of the resulting impact. *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 781 (6th Cir. 1998).

As the *Cehrs* court observed in its consideration of "psoriasis," there is no "cure" for Pearson's alcoholism. While Plaintiff Pearson has achieved a degree of success in the struggle to manage his alcoholism, particularly when involved in a continuing treatment program, this struggle is ongoing—as is the need for support. Testifying to the crucial assistance provided by the Employee Assistance Program (when allowed access to it), Pearson explains that "[u]nder this program I was required to go to the EAP office at UH [University Hospitals] 3 times per week to give samples. The discipline of participating in this program helped to keep me sober." (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). Although a lapse results in binges and the total loss of control that Pearson describes in his affidavit, equally if not more important to consider, under the final *Cehrs* factors, is 1) the life-long duration of this condition and 2.) the unrelenting, day-to-day impact of this condition on Pearson's life. As Pearson explains, "I have been an alcoholic for 26 years. Not a day goes by that I do not have craving for a drink. My

14

compulsion is so strong that on many days I feel nauseous.  Sometimes I start shaking and sweating for no reason." (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1).

Because plaintiff Pearson has now shown 1.) that his alcoholism constitutes a mental and physical impairment, 2.) that it involves major life activities, and 3.) that it substantially impacts such life activities, his alcoholism therefore qualifies as a recognized disability under the ADA.  Consequently, Plaintiff Pearson has satisfied the first prong of his *prima facie* case of disability discrimination under the ADA.

### 2.  Derek Pearson is otherwise qualified for the position of Patient Transporter, with or without reasonable accommodation

Plaintiff Pearson also satisfies the second prong of his prima facie case, since he is otherwise qualified for his former position as a Patient Transporter at University Hospitals.

In another Sixth-Circuit case involving the disability of alcoholism (based on the "regarded-as" section [B] of the statutory definition), the Court cites the ADA's statutory language, from 42 U.S.C. § 12111(8), upon which the "otherwise-qualified" prong of the *prima facie* case is founded: "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual desires.'" *Moorer v. Baptist Memorial Healthcare System*, 398 F.3d 469.  In *Cehrs,* the Court has further held that the plaintiff's burden of establishing that he or she is qualified for a position *with* a reasonable accommodation is not "onerous." *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 781 (6th Cir. 1998).

Significantly, in the instant case, Defendant concedes in its Motion for Summary Judgment that plaintiff's "ninety day period as a new employee was uneventful." This concession is also supported by documents recording Pearson's satisfactory completion of his probationary period as a Patient Transporter at University Hospitals. Given that this trial period and successful evaluation at University Hospitals predated the time when Pearson received any semblance of "accommodation" for his disability, this performance record therefore represents clear evidence of Pearson's qualifications for the position of Patient Transporter, even *without* reasonable accommodation. The latter performance record also corroborates Plaintiff Pearson's claim that he never once reported for work (at this or any other job) after drinking. Finally, as Plaintiff Pearson makes clear, his participation in the Employee Assistance Program at University Hospitals had the specific effect of aiding him in resisting the "cravings" to drink. (Plaintiff Affidavit, Attached hereto as Plaintiff's Exhibit 1). Therefore, given that Pearson's continued access to this program would have further enabled Pearson in his struggle to manage his disability, while continuing to perform the essential functions of his job, it follows that Plaintiff is and was otherwise qualified for his position at University Hospitals with or without the minimal accommodation that he received.

### 3. Derek Pearson has suffered an adverse employment decision

Plaintiff Pearson's termination by Defendant University Hospitals certainly satisfies the third prima-facie case requirement that the ADA plaintiff has "suffered an adverse employment decision." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), and *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 779 (6th Cir. 1998).

16

Although assured by defendant representatives less than a week beforehand that he was an employee in good standing at University Hospitals of Cleveland, plaintiff Pearson was not permitted to return to work and, ultimately, was terminated by Steven Krall on January 10, 2006. Although Defendant offered an allegedly non-discriminatory justification for the termination decision, the fact that this termination decision was made and carried into effect by Steve Krall is not in dispute. Therefore, since Plaintiff is the one who was terminated, it is certainly fair to say that he has "suffered an adverse employment decision."

4. **University Hospitals of Cleveland knew or should have known of Derek Pearson's disability**

All evidence points to the conclusion that Defendant knew or should have known of Pearson's disability. In order to satisfy the fourth requirement of the *prima-facie* case, the ADA plaintiff must show that "the employer knew or had reason to know of the plaintiff's disability." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), and *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 779 (6th Cir. 1998).

Defendant knew full well of Derek Pearson's disability, since they were directly informed of the fact by plaintiff Derek Pearson in June of 2005. At this time, in a conversation with his supervisor, Steve Krall, Plaintiff told Mr. Krall that he suffered from the disability of alcoholism. During that conversation, Plaintiff specifically requested that he be allowed to enter the Hospital's Employee Assistance Program so that he could find help with his alcoholism. Given 1) this initial conversation, 2) the documented history of plaintiff's subsequent involvement with the EAP, and 3) the

17

expressed attempts by plaintiff to enter the Salvation Army's in-patient program in early January of 2006, it is clear that Defendant was continuously informed about, and had full knowledge of, Mr. Pearson's disability.

> **5. After being instructed by his supervisor to remain absent from work and seek medical treatment for his disability, Derek Pearson was subsequently terminated by University Hospitals of Cleveland on the basis of this very instruction**

Plaintiff is also able to satisfy the final requirement of his *prima facie* case, which requires the ADA plaintiff to show either 1.) "that the position remained open while the employer sought other applicants" or 2.) that "the disabled individual was replaced." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), and *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 779 (6th Cir. 1998).

In a series of telephone conversations in early January of 2006, Steven Krall responded to Mr. Pearson's repeated requests to return to University Hospitals—initially for the purpose of attending his treatment program and subsequently for the purpose of returning to work—by instructing Mr. Pearson *not* to come to University Hospitals at all. In directing Mr. Pearson to remain absent from University Hospitals so as, ostensibly, to "get the medical help that you need," Steve Krall brought about two related consequences: 1) Mr. Pearson was denied physical access to EAP, the program representing the defendant's only offered "accommodation" of Mr. Pearson's disability and 2.) Mr. Pearson's continued absence from the University Hospital workplace—the purported basis for the termination decision—was ensured. Through these acts of

18

plaintiff's supervisor, Steve Krall, defendant University Hospitals of Cleveland not only precluded Mr. Pearson from resuming his position, but did so as a means to replace him.

### D. Defendant's proffered explanation that plaintiff Derek Pearson's allegedly "excessive absenteeism" motivated the defendant's termination decision is pretextual

**1.) In merely repeating its claim that Plaintiff's regular attendance was an essential function of his position at University Hospitals, Defendant has failed to sustain its burden of persuasion**

According to the applicable Sixth-Circuit case law, a defendant employer's argument that regular attendance or another criterion was an "essential function" of a job is treated as an affirmative defense.  As a result, such an argument must sustain not simply the burden of going forward, but the burden of persuasion. *Hamlin v. Charter Township of Flint*, 165 F.3d 426 (6th Cir. 1999).   In merely repeating the unsubstantiated claim that Defendant Pearson's regular attendance was an essential function of his job as a Patient Transporter, Defendant has failed to sustain its burden of persuasion, which the Sixth-Circuit requires for an argument of this kind.

**2.) Defendant' presumption that uninterrupted attendance is an essential job function has been invalidated by the Sixth-Circuit**

In merely repeating its assertion that uninterrupted attendance represented an essential function of Plaintiff Pearson's position as a Patient Transporter, Defendant has, in effect, treated its claim not as an argument to be supported but as a presumption. However, the presumption relied upon by Defendant that uninterrupted attendance is an essential job function has been invalidated by Sixth-Circuit precedent (see *Cehrs v.*

19

*Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775 [6th Cir. 1998]).   This presumption, therefore, must be rejected.

**3.) Defendant's position that Plaintiff's request for unpaid medical leave in early January amounts to "excessive absenteeism" is not supported by Sixth-Circuit case law**

Defendant has argued in its Motion for Summary Judgment that Plaintiff's requested medical leave in early January amounts to "excessive absenteeism."   However, this allegation is contrary to Sixth-Circuit case law, which treats such a request for unpaid medical leave as a request for a reasonable accommodation (see *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775 [6th Cir. 1998]).   Therefore, given that Defendant's justification for its termination decision is at odds with Sixth-Circuit precedent, this proffered justification must be rejected.

### III.   CONCLUSION

Plaintiff has now put forward his *prima facie* of discrimination under the ADA and has demonstrated that Defendant's proffered explanation for its conduct is pretextual. Given that Plaintiff has now made the two-part demonstration required by the Sixth Circuit to defeat a motion for summary judgment in a case of discrimination under the Americans with Disabilities Act, the Defendant is not entitled to Summary Judgment in this case.   This motion, therefore, should be denied.

Respectfully submitted,

_____

Lance B. Johnson, Attorney for Plaintiff
Ohio Registration No. 0010790
1944 Epping Road, Gates Mills, Ohio 44040
Office: 440-423-1782; Fax: 440-378-4700
Email: lbjatt@ameritech.net

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Plaintiff's Reply to Defendant's Motion for Summary Judgment was electronically filed on Friday, October 5, 2007.  Notice of this filing will be automatically forwarded to record counsel via the Court's Electronic Filing System.

                                        _____

Lance B. Johnson, Attorney for Plaintiff
Ohio Registration No. 0010790
1944 Epping Road
Gates Mills, Ohio 44040
Office Phone: 440-423-1782
Facsimile: 440-378-4700
Email: lbjatt@ameritech.net