IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEREK PEARSON, | CASE NO. 1:06CV1974 |
| Plaintiff, | JUDGE OLIVER |
| v. | MAGISTRATE JUDGE VECCHIARELLI |
| UNIVERSITY HOSPITALS OF CLEVELAND, | **REPORT AND RECOMMENDATION** Docket # 32 |
| Defendant. | |

This case is before the magistrate judge on referral. Pending is the motion of defendant, University Hospitals of Cleveland ("UHHS" or "the hospital") for summary judgment (Doc. 32). Plaintiff, Derek Pearson ("Pearson"), opposes the hospital's motion (Doc. 34). For the reasons stated below, the court recommends that the hospital's motion be GRANTED in full.

I. Background

The court views the facts, as it must, in the light most favorable to the party opposing the motion for summary judgment. Plaintiff alleges or does not deny the following facts.

Pearson is an advanced alcoholic, suffering from the condition for many years prior to his employment with the hospital. Pearson alleges that he deals with cravings every day. According to Pearson, when he does not drink he often feels nauseous, shaky, and anxious for no apparent reason. He believes that the anxiety he experiences aggravates his arthritis. When Pearson does drink, he binges. He alleges that when he drinks the simplest tasks become impossible and he does

not eat or otherwise care for himself.

The hospital hired Pearson as a patient transporter on June 17, 2004. When the hospital hired Pearson, it informed him of its attendance policy. In relevant part, the hospital's attendance policy regards any unapproved absence as an occurrence of absenteeism. Three occurrences of absenteeism in any consecutive four month period subjects the employee to progressive discipline up to and including discharge. The hospital gives supervisors discretion in responding to problematic absenteeism.

Pearson had no trouble with attendance during his 90 day probationary period. He began to incur unexcused absences in November 2004 when he was absent on the 4th, 5th, 8th, and 9th of that month. Pearson's supervisor warned him that these absences would be counted against him, and he received a Corrective Action on November 12, 2004, warning him that further absences would result in corrective action up to and including discharge.

On November 16, 2004 Pearson notified his department head, Steve Krall ("Krall"), that he was an alcoholic. Pearson began treatment at St. Vincent's Charity Hospital ("St. Vincent's") through UH's Employee Assistance Program ("EAP"). Pearson signed a contract with the EAP on December 9, 2004, promising to attend all scheduled appointments and comply with treatment recommendations, abstain from drugs and alcohol, and provide urine or blood screening as requested by his supervisor. The EAP also required Pearson to produce urine samples three times a week. Pearson believes that the requirement to produce regular urine samples helped him to stay sober.

Pearson again had problems with absences in the second quarter of 2005. He was absent on April 4; May 12, 13, and 16; and June 4, 5, 6, and 9. He received two Corrective Actions for these absences and was again warned that further absences could lead to discipline up to and including

discharge.

In the third quarter of 2005 Pearson had unexcused absences on July 17, 19, and 20; August 17, 18, and 19; and September 5,6,7,8, 10, 11, and 12. On September 14, 2005, he was admitted to St. Vincent's for inpatient detoxification for alcoholism. Krall gave him a mandatory referral to the EAP. Pearson agreed that if he was non-compliant with his EAP that his supervisor would be notified and again acknowledged that non-compliance could result in his termination.

On September 23, 2005 Pearson received a Corrective Action that stated that this was a "final warning" and that additional unexcused absences could lead to termination. On November 29, 2005 Pearson began treatment for alcoholism at Addiction Recovery Services, a division of UHHS.

On Sunday evening, January 1, 2006, Pearson felt anxious and shaky and experienced pain in his joints, especially in his back. He called in sick that evening. On Monday January 2006, he also left messages with his alcoholism recovery program and with his EAP that he was sick.

On Tuesday January 3, 2006 Pearson again called into work sick and notified his outpatient program and the EAP office that he was sick. He also called Sue Peplowski ("Peplowski") in the office of employee affairs and asked about his status under the tardiness policy to see if it were safe for him to be absent for illness. Peplowski told Pearson that it was all right for him to be absent for illness and that he was in compliance with the attendance policy.

On Wednesday January 4, 2006 Pearson continued to feel ill. In addition to calling his outpatient program and his EAP office and notifying them that he was sick, he also telephoned Krall. He told Krall that he was suffering from joint pain and high blood pressure and, when asked, denied that he had been drinking. Pearson also told Krall that he had talked to Peplowski, who had told him

3

that he was allowed to be absent if he were sick.  Krall told Pearson not to worry about attendance or work and not to report to work until he had pulled himself together.  Pearson also told Krall that he was unable to attend his alcohol recovery program meetings.  Krall told him that because the meetings were on the grounds of UHHS, he could not attend the meetings and still be absent from work.  Krall advised him, therefore, to stay home until he felt better.

Pearson felt better on Thursday January 5, 2006.  He telephoned Krall and told him that he believed he could come to work.  Pearson reminded Krall that he was missing the alcohol program meetings that he needed to stay sober.  Krall told Pearson that he did not need to come to work and had nothing to worry about.

Pearson telephoned Krall twice on Friday January 6, 2006.  The first time Pearson called he told Krall that he was feeling better and needed to go to his treatment sessions.  Krall told Pearson to get himself together before coming back to work.  The second time Pearson told Krall that it was important that he go to treatment sessions, even if Krall did not believe that Pearson should be working.  Pearson suggested that he attend the Salvation Army treatment program, as he had not heard back from his alcohol recovery program since notifying the program that he was sick.

When Pearson telephoned Krall on Saturday January 7, 2006, Krall told Pearson to go ahead and attend the Salvation Army program and that Krall would take care of the necessary paperwork.  Krall also warned Pearson that he would have to go through the patient intake program before returning to work.

On Sunday January 7, 2006, Pearson telephoned Krall and told him that he needed to start the Salvation Army program immediately but that he could not attend the program unless he were working.  Krall told him not to come to work.

4

On Monday January 8, 2006, Pearson talked to a representative of the Salvation Army program. The representative told him that the program was a 90-day inpatient program but that UHHS would only allow him 30 days off from work. Pearson also talked with a representative of his insurance program who told Pearson that his insurance would not cover an inpatient program. A representative from the EAP finally returned Pearson's call, and they discussed what Pearson needed to do to return to compliance with the EAP. Finally, Pearson called Krall, reported that he had re-connected with the EAP, and asked to come to work. Krall would not allow Pearson to come to work, but told Pearson that he could come to UHHS to participate in his EAP.

On Tuesday January 9, 2006 Pearson attended his EAP. A program representative told Pearson that Krall had no right to keep Pearson from attending program meetings. Pearson telephoned Krall and told him that he was back in the EAP and needed to know when he could return to work. Pearson also talked to his employee assistance counselor, who told him that his missed a drug screening was not a problem because he had been sick. Pearson also made a number of telephone calls to Krall, Peplowski, and his employee assistance counselor to determine when he could return to work. Finally, Krall called Pearson and told him that he had been terminated. When Krall told the personnel department that he wanted to file a grievance, he was told that he could not do so.

On July 20, 2006 Pearson filed in state court a complaint against UHHS alleging willful discrimination in violation of the Americans with Disabilities Act ("ADA"). UHHS removed the complaint to federal court on August 17, 2006.

II

Summary judgment is appropriate where there are no genuine issues of material fact and the

5

moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The moving party can meet this burden in two ways: by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing the non-moving party, after adequate time for discovery, has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may rely on depositions, answers to interrogatories, and the like, to demonstrate that the non-moving party has no evidence to prove his case and hence that there can be no factual dispute. *See id.* at 328 (White, J., concurring). But "it is not enough to move for summary judgment . . . with a conclusory assertion that the [non-moving party] has no evidence to prove his case." *Id.*

Once the moving party has met its burden, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *See Cox v. Kentucky Department of Transportation*, 53 F.3d 146, 149 (6th Cir. 1995). The trial court has no "duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). That is, the nonmoving party has an affirmative duty to direct the court's attention to specific evidence upon which it seeks to rely. *Al-Qudhai'een v. America West Airlines, Inc.*, 267 F. Supp.2d 841, 845 (S.D. Ohio 2003) (citing *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)). The lack of such a response by the nonmoving party may result in an automatic grant of summary judgment. *Reeves v. Fox Television Network*, 983 F.Supp. 703, 709 (N.D. Ohio 1997).

When evaluating a motion for summary judgment, "the inferences to be drawn from the

underlying facts . . . must be viewed in the light most favorable to . . . the party opposing the motion . . . ." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962). In addition, the Court "does not weigh the evidence or make credibility determinations." *Id*. However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986). In other words, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251.

### III

Pearson alleges willful discrimination against him because of his disabling alcoholism in violation of the ADA. UHHS denies that Pearson is disabled and also asserts that it properly terminated Pearsons for absenteeism.

The ADA mandates that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." 42 U.S.C. § 12112(b)(5).

When a plaintiff alleges discrimination because of a disability and the plaintiff has no direct

evidence of discrimination, "the plaintiff may attempt to establish his or her claim indirectly through the burden shifting method borrowed from *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973),] by establishing a *prima facie* case of discrimination and shifting the burden to the employer to offer a legitimate, nondiscriminatory reason for its action." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1184-85 (6th Cir. 1996). A plaintiff may establish a *prima facie* case of discrimination by showing by a preponderance of the evidence that: "(1) he has a disability; (2) he is 'otherwise qualified' for the job; and (3) defendants . . . made an adverse employment decision regarding him solely because of his disability." *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997). If plaintiff contends that he or she could perform the essential functions of the job with a reasonable accommodation, plaintiff has the burden of proposing an accommodation and of showing the accommodation to be objectively reasonable. *Id.* The employer then has the burden of showing that the proposed accommodation would impose an undue hardship. *Id.* In the Sixth Circuit, a defendant is liable for impermissible discrimination only when the plaintiff's disability is the sole reason for the negative employment action. *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 454 (6th Cir. 2004); *see also discussion at Layman v. Alloway Stamping Mach. Co., Inc.*, 98 Fed. Appx. 369, 375-75 (6th Cir. 2004).

If the plaintiff establishes a *prima facie* case "in the absence of an explanation by the employer, [there is] a mandatory inference that the employer intentionally discriminated against the disabled individual by taking an adverse employment action 'solely' because of his or her handicap." *Monette*, 90 F.3d at 1185 (citations and footnote omitted). If, however, "the employer offers a legitimate reason for its action that is unrelated to the employee's disability, the plaintiff will bear the burden of establishing that the proffered reason is a pretext for unlawful discrimination." *Id*. at

8

1185-86.  A plaintiff may raise a genuine issue of material fact as to the validity of proffered legitimate reasons by showing by a preponderance of the evidence any of the following:  "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.*"  Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996).  "At all times, the plaintiff bears the ultimate burden of persuading the trier of fact that illegal discrimination took place." *Id.*

Defendant contends that (1) Pearson is not disabled within the meaning of the ADA because his impairment is not so serious as to substantially limit his ability to perform any major life activity; (2)Pearson is not otherwise qualified to perform the essential functions of his job; and (3) UHHS had a legitimate, non-discriminatory reason for terminating Pearson.  Pearson challenges these contentions.

*A.   Whether Pearson's impairment substantially limits his ability to perform any major life activity*

The ADA defines the term "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (1994).  An impairment is "substantially limiting" if it results in an inability to perform or a severe restriction on the ability to perform a task compared to the average person in the general population, *see* 29 C.F.R. § 1630.20(j)(2).  "[T]o be substantially limited . . . an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg., Ky, Inc. v. Williams*, 534 U.S. 184, 198 (2002).  "[M]ajor life activities" includes functions such as caring

for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i). "The impairment's impact must also be permanent or long-term." *Toyota Motor*, 534 U.S. at 198. An individual does not prove disability status merely by submitting evidence of a medical diagnosis of an impairment. Rather, the ADA requires persons "claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience is substantial." *Id.* (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)). "The central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Id.* at 11.

Alcoholism is an "impairment" that may constitute a disability within the meaning of the ADA. *See Bragdon v. Abbott,* 524 U.S. 624, 632 (1998); *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 336 (2002) (citing collected cases at *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002)). In Pearson's case, the relevant inquiry is whether his alcoholism substantially limits his ability to perform one or more major life activities.

UHHS argues, first, that when Pearson was sober his alcoholism does not substantially limit any major life activity. Pearson concedes that when he is sober his alcoholism does not interfere with his ability to participate in activities and that he is able to live a normal life.[1] *See* Pearson

---

[1] This was Pearson's testimony during his deposition. Pearson's opposition brief, however, was accompanied by an affidavit from Pearson asserting that when Pearson is not drinking he feels nauseous on many days, starts shaking and sweating for no reason, and becomes anxious and nervous. Pearson aff., Doc. 34, Exh. 1. Pearson's affidavit also asserts that the anxiety associated with his alcoholism contributes to arthritis flare-ups that sometimes prevent him from working. A party may not create a material issue of fact on summary judgment, however, by producing an affidavit that contradicts the party's earlier deposition testimony. *Peck v. Bridgeport Machines, Inc.*, 237 F.3d 614, 619 (6th Cir. 2001); *see also Clinton River Cruise Co. v. DeLaCruz,* 213 Fed. Appx. 428, 434 (6th Cir. 2007). To the extent, therefore, that the Pearson affidavit must be read as

depo., Doc. 32, Exh. 12, pp. 139, 166. UHHS also argues that Pearson's alcoholism does not impair his ability to work and quotes Pearson's deposition testimony in support of this argument:

> Q. So did your alcoholism affect your job at University Hospital in any way?
>
> A. No.
>
> Q. Did alcoholism affect your ability to work at any job?
>
> A. No.
>
> \* \* \* \* \*
>
> Q. Did your alcoholism affect your ability to work for any employer where you worked before you were employed at University Hospital?
>
> A. No.
>
> B. And has it affected your ability to work for the county at the Justice Center?
>
> A. No, not at all.

Pearson depo. at 137, 141-142.[2] Pearson's deposition testimony, therefore, demonstrates that his alcoholism does not affect his ability to work.

UHHS is less successful in arguing that Pearson's alcoholism does not substantially limit his major life activities when Pearson drinks. UHHS does not challenge Pearson's assertion that when he drinks the simplest tasks become impossible and he does not eat or otherwise care for himself. Rather, UHHS asserts that Pearson drinks too infrequently to permit the conclusion that his drinking substantially limits these life activities. UHHS cites Pearson's deposition testimony to demonstrate

---

asserting that Pearson's alcoholism interferes with Pearson's ability to lead a normal life when he is sober, it will be disregarded by the court.

[2] Page 142 of the Pearson deposition is found at defendant's Reply (Doc. 36), Exh. 20. Pearson worked at the Justice Center subsequent to his termination by UHHS.

that Pearson drinks and incapacitates himself about 10% to perhaps 20% of the time. UHHS asserts that such infrequent occurrences of incapacity cannot sustain a finding of disability within the meaning of the ADA.

The caselaw that UHHS cites, however, does not adequately support this argument. UHHS relies on *Brown v. BKW Drywall Suppky, Inc.*, 305 F. Supp. 2d 814 (S.D. Ohio 2004); *Ryan v. Grae & Ribicki*, 135 F.3d 867, 870 (2d Cir. 1998); *O'Neal v. Johns Manville Int'l, Inc.*, 2005 WL 1221822 (N.D. Ohio May 20, 2005); *Johnson v. New York Med. Coll.*, 1997 WL 580708 (S.D.N.Y. Sept. 18, 1997); *Roush v. Weastec, Inc.*, 96 F.3d 840 (6th Cir. 1996); *Vulcu v. Trionics Research Lab., Inc.*, 993 F. Supp. 623 (N.D. Ohio 1998); and *McDonald v. Pennsylvania Dep't of Pub. Welfare*, 62 F.3d 92 (3d Cir. 1995), in making this argument. These cases are clearly distinguishable, however, from the instant case. In *Brown*, the plaintiff was unable to walk for a single three week period due to loin pain hematuria syndrome. There was no repetition of this incapacity. In *Ryan*, the plaintiff was symptomatic for colic only in summer months and went for years at a time without manifesting symptoms. The plaintiff in *O'Neal* never claimed that he was incapacitated when he drank. Although the plaintiff in *Johnson* averred that her colitis substantially interfered with work and sex, the court found otherwise. According to the *Johnson* court, colitis did not substantially limit work and sex because (1) Johnson testified that for four years she missed only a few days of work and her work was not otherwise impacted by her colitis and (2) colitis did not interfere with her reproductive functions. In *Roush*, the court found that plaintiff's kidney condition was temporary and that the mere possibility that it might recur did not make the condition permanent. The plaintiffs in *Volcu* and *McDonald* each suffered a single occurrence of incapacity of a relatively short duration. Thus, these cases do not adequately support the proposition that, by law, regularly-occurring periods of

inebriation resulting in incapacity about 10% to 20% of the time cannot sustain a finding of disability within the meaning of the ADA.  A reasonable jury could conclude, therefore, that Pearson's alcoholism substantially limits some major life activities.

*B.*     *Whether Pearson is otherwise qualified to perform the essential functions of his job*

UHHS contends that Pearson is not otherwise qualified to perform his job as a transporter because Pearson is frequently absent and attendance is an essential function of the job.  UHHS supports this contention by asserting that (1) courts must assume that attendance is an essential function of most jobs and (2) Pearson is absent so infrequently that, by law, he is not satisfying the essential requirement that he be present at his job.

Although UHHS asserts that "[t]he Sixth Circuit has held that regular attendance is an essential function of almost every job," the cases UHHS cites do not support this proposition.  The only Sixth Circuit case that UHHS cites, *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998), merely stands for the proposition that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."  This is not sufficient to establish a legal presumption that attendance is an essential function of most jobs.  Rather, it requires a court to inquire as to "the attendance requirements of the job at issue."

Moreover, even if UHHS were to establish that attendance is an essential function of most jobs, this would not help its case a great deal.  That attendance is an essential function of *most* jobs does not establish that attendance is an essential function of *this* job.  Further, because "attendance"

cannot mean "perfect attendance,"[3] the issue of how much absenteeism is necessary before one no longer performs the essential function of attending work will always arise.  In sum, the question of whether attendance is an essential function of most jobs is a red herring that does not significantly advance UHHS's case.[4]

When a plaintiff alleges discrimination on the basis of disability, plaintiff has "the burden of establishing that he or she is otherwise qualified to perform the essential functions of the job . . . . The employer then bears the burden of proving that a particular job requirement [not addressed by plaintiff] is essential as a business necessity . . . ."  *Monette*, 90 F.3d at 1183 n.8.  Pearson

---

[3] Courts may not presume that uninterrupted attendance is an essential job requirement. *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998)

[4] The other cases that UHHS cites to establish a presumption that attendance is an essential job function do not relieve UHHS of the responsibility of demonstrating that attendance was an essential function of *Pearson's* job and how much absenteeism could be tolerated before it might be said that Pearson was no longer performing the essential function of attending work.  In *Cowin v. Lutheran Hosp.*, 1998 WL 180974 (N.D. Ohio May 18, 1998), the court found that "the ability to appear at work is an essential element of performing a job and, thus, an employee who is routinely absent from work in [sic] not able to perform the essential functions of a job."  *Id.* at *2.  But the plaintiff in *Cowin* was unable to come to work indefinitely due to asthma triggered by exposure to dust in the workplace.  UHHS cites *Carr v. Reno*, 23 F.3d 525 (D.C. Cir. 1994), for the proposition that "coming to work is an essential function."  The closest the *Reno* court came to this proposition, however, was in its finding that "an essential function of any government job is the ability to appear for work (whether in the workplace or, in the unusual case, at home) and to complete assigned tasks within a reasonable period of time."  *Id.* at 530.  In *Jackson v. Veterans Admin.*, 22 F.3d 277 (11th Cir. 1994), the court found that an employee who was absent six times in two and a half months *during his probationary period* was not performing the essential functions of his job as a housekeeper.  In *Tyndall v. National Educ. Ctrs., Inc.*, 31 F.3d 277 (4th Cir. 1994), the plaintiff teacher missed 40 days of work in seven months, including missing the two key days on which her attendance was especially important and requesting an excused absence for the third such key day.  The *Tyndall* court concluded, "Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform *any* of his job functions, essential or otherwise.'"  *Id.* at 213 (quoting *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D. Tenn.1986), *aff'd,* 831 F.2d 298 (6th Cir. 1987)).  These cases do not carry UHHS past the unremarkable proposition that most jobs require some level of attendance.

demonstrates that he is otherwise qualified for the job as person transporter by noting that he completed his probationary period without problems. If UHHS contends that attendance is an essential function of the job and that Pearson's level of attendance does not satisfy the job's requirements, the burden is on UHHS to support these contentions. Defendant offers no document,[5] deposition testimony, or affidavit to establish what level of absenteeism on the part of a patient transporter imposes an undue hardship on UHHS.[6] The court cannot say, therefore, that Pearson's 29 absences in 18 months and his absence in January of 2006 require the legal conclusion that Pearson is not otherwise qualified to perform his job because his absences prevent him from performing the essential functions of his job. For this reason and because Pearson's incapacity due to alcoholism is not so sporadic as to preclude a conclusion that Pearson was substantially limited in some major life activities, the court is unable to conclude as a matter of law that Pearson is not disabled.

C.  *Whether UHHS had a legitimate, non-discriminatory reason for terminating Pearson*

UHHS argues that even if Pearson is able to establish a prima facie case of discrimination,

---

[5] The job description found in Job Description and Performance Appraisal, Doc. 32, Exh. 6, p. 1, does not mention that absences by a transporter would impose a particular hardship on UHHS.

[6] The question of what level of attendance is "essential" to performance of a job might productively be viewed as determining at what point absences impose an undue hardship on an employer, since tolerating absences is essentially an accommodation to the employee's alleged disability. *See* the discussion in *Cehrs*, 155 F.3d at 781-783, examining a request for leave as a reasonable accommodation and in *Monette*, 90 F.3d at 1184 n.10, examining the interrelationship between "undue hardship" and "reasonable accommodation." While unanticipated absences are not the same as requested leave, both place a burden on the employer. In the case of requested leave, that burden is of a set duration. In the case of unexpected absences, the level of burden is usually determined by prior level of attendance or the opinion of a treating physician and by the unexpected nature of the absences. In either case, the question should be whether the employee's absences impose an undue hardship on the employer.

15

Pearson cannot show that UHHS's legitimate, non-discriminatory reason for terminating Pearson, *i.e.*, his absences, was a mere pretext for discrimination. Pearson contends that this argument is structurally identical to defendant's argument that Pearson was unqualified to perform the essential functions of his job because of his absenteeism. There is an important distinction, however, between the two arguments. Pearson having offered evidence that he is able to perform the essential functions of his job, the burden was on UHHS to demonstrate otherwise. But UHHS having offered a legitimate, nondiscriminatory reason for terminating Pearson, the burden is on *Pearson* to demonstrate that this reason is pretext. Pearson fails to carry his burden.

The only counterarguments that Pearson offers to demonstrate that absenteeism was not the actual reason for Pearson's termination are (1) the Sixth Circuit does not require uninterrupted attendance as an essential function of any job and (2) the court in *Cehrs* held that a request such as Pearson's for unpaid leave is not "excessive absenteeism." The first argument is unavailing, as UHHS does not contend that uninterrupted attendance was a requirement of the job of person transporter. The second argument misstates and misapplies the holding in *Cehrs*. In *Cehrs*, the Sixth Circuit held that a court should not presume that a request for leave as a proposed reasonable accommodation would impose an undue burden on an employer. Rather, *Cehrs* directed courts to look at the facts of each case to determine whether the proposed accommodation would impose an undue burden on the employer. In *Cehrs*, the plaintiff had a single lengthy absence of several months' duration during which the plaintiff requested leave to deal with the medical cause of the absence. The Sixth Circuit reversed a lower court which found that such a request for leave was unreasonable as a matter of law. *Cehrs* does not in any way support Pearson's contention that when an employer terminates an employee after 29 absences in 18 months and after an additional absence

16

followed by a request for leave, the employer's assertion that the employee was terminated for excessive absenteeism is mere pretext. Thus, Pearson offers no relevant arguments to demonstrate that UHHS's legitimate reason for terminating Pearson was pretextual.

UHHS had an attendance policy that three occurrences of absenteeism in any consecutive four month period subjects the employee to progressive discipline up to and including discharge. Pearson violated that policy four times and received four Corrective Actions for excessive absenteeism, the last of which told Pearson that it was a "final warning." Pearson was subsequently absent for more than four consecutive days. Pearson fails to offer any relevant argument that UHHS's proffered legitimate reason for dismissing him, absenteeism, is mere pretext. Under these circumstances, no reasonable jury could find that UHHS impermissibly discriminated against Pearson by terminating him solely because of his disability.

## IV. Conclusion

For the reasons given above, the magistrate judge recommends that the court grant defendant's motion for summary judgment and enter judgment in favor of UHHS and against Pearson.


Dated: March 12, 2008                s:\Nancy A. Vecchiarelli
                                     Nancy A. Vecchiarelli
                                     United States Magistrate Judge

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v.Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**